**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **EVELYN LONG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 03-3425-CV-S-RED** |
| | ) | |
| **ARAMARK UNIFORM AND** | ) | |
| **CAREER APPAREL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Now before the Court is Defendant's Motion for Summary Judgment (Doc. 60). Plaintiff brought her six-count Petition in Missouri state court, alleging sexual harassment, disparate treatment and pay because of sex, retaliation, discriminatory and constructive discharge in violation of federal and state law. The Petition was removed to this Court by Defendant, which now moves for judgment as a matter of law on each of Plaintiff's claims. After carefully reviewing the parties' Suggestions in Support of and in Opposition to the Motion and the relevant exhibits and facts in the record, and for the reasons below, the Court GRANTS Defendant's Motion.

### I. Factual Background

*A. The Parties and Plaintiff's Employment*

Defendant Aramark Uniform and Career Apparel, Inc., is in the business of industrial cleaning, laundry, and uniform rental services. Aramark operates "Market Centers" which house production facilities, service, and office administration functions. Aramark also operates service depots, which are branch locations. Each Market Center is led by a General Manager. The Production Manager reports to the General Manager. The General Manager in the "Gateway

Region" (which included the areas of Springfield and Republic, Missouri) was Gary Walker from the time Plaintiff began her employment until August 2000. After that period Brian Hardman replaced Walker as General Manager. The Production Manager was Roger Weis.

Plaintiff Evelyn Long began working for Defendant in May 1997 as a part-time plant worker and became full-time in November 1998. In approximately the first eighteen months of her employment, she worked in various positions wherever Weis needed her. In October 2000, Plaintiff was promoted to the position of "Stockroom Lead." In that position, Plaintiff's responsibilities included filling customer orders from the garments in stock, checking in uniforms, and overseeing the group of employees assigned to the stockroom to handle the day-to-day duties. As Stockroom Lead, Plaintiff reported to General Manager Hardman and Production Manager (who Plaintiff refers to as "Plant Manager") Weis. Plaintiff was also indirectly supervised by Warren Smith, Supply Chain Manager, who was responsible for Aramark Stockrooms in the region. Plaintiff also claims that she was indirectly supervised by District Manager Dick Covey, who reviewed Plaintiff's stockroom tickets and, according to Plaintiff, appeared to be in charge when her supervisors were absent from the Market Center.

According to Plaintiff she resigned from her job on September 18, 2002. However, she continued to work until November 8, 2002. Defendants sent Plaintiff a letter terminating her employment effective November 13, 2002. The letter cited "Job Abandonment" as the reason for termination; that is, that Plaintiff did not come to work or notify management of an absence for three consecutive scheduled work days.

*B. Plaintiff's Complaints*

In her Suggestions in Opposition to Summary Judgment, Plaintiff offers a number of

-2-

complaints to demonstrate that she was treated less favorably as a female and subjected to a hostile work environment. There appear to be two types of activities of which Plaintiff complains. First, Plaintiff alleges that a number of her co-workers and even some of her managers engaged in inappropriate, sexual behavior and made inappropriate comments at and about Plaintiff. Plaintiff also claims that the whole plant was a "sexual playground" that interfered with her work. She alleges that those who participated in the sex play did not do their share of the work and were thereby treated more favorably, and those who did not were shouldered with more work and thereby treated less favorably.

### 1. Acts and Comments Made Toward Plaintiff[1]

Plaintiff alleges that her supervisors made a number of offensive comments and took sexually hostile actions toward her. It began shortly after Plaintiff was hired in 1997, when General Manager Gary Walker spent the day "hitting on" Plaintiff.

Plaintiff claims that some time in June 2002, Plaintiff accompanied then-General Manager Hardman and Warren Smith for training in Illinois regarding the new plant. While there, the three went to a bar to eat dinner. Plaintiff used the restroom, and when she returned the two men were laughing. Plaintiff asked what they were laughing about, and a female bartender showed Plaintiff a photograph of the bartender holding her vagina open to urinate in a men's room urinal. Plaintiff stated that she was offended. The next week at work, Hardman asked Plaintiff, in front of Plaintiff's

---

[1]     Defendant noted in its Reply Suggestions in Support of its Motion that "[b]ecause Long invented enough allegations (which Aramark denies) to create a fact issue as to the severity or pervasiveness of the alleged harassment, Aramark did not move for summary judgment on that basis." *Def.'s Reply Suggestions* at 2-3. For that reason, the Court does not recount each and every incident and comment Plaintiff claims she endured, but instead highlights the most prominent facts upon which Plaintiff's complaints are based.

Case 6:03-cv-03425-RED   Document 107   Filed 04/29/05   Page 3 of 28

daughter, who was also employed by Defendant: "Have you been practicing?" and then, when it appeared Plaintiff did not understand the inquiry, proceeded to describe the picture. Plaintiff states that she told Hardman that she was offended.

Plaintiff claims that Production Manager Roger Weis subjected her to numerous incidents of harassment. She claims that he began regularly hanging around Plaintiff and regularly talked to Plaintiff about his and other employees' sexual partners, stories, and sex lives. He attempted to set up Plaintiff with other male employees at the plant, knowing that Plaintiff is married. Plaintiff claims that Weis commented about Plaintiff's pager as being necessary for her "other work" (insinuating that Plaintiff was a prostitute), asking Plaintiff, who is a vegetarian, if she doesn't "eat meat," (referring to male sex organs), and telling Plaintiff that there was a poll in the building and that Plaintiff had "the best ass in the place." She also claims that Weis gave preferential treatment to women who were part of the "culture of sex play" in the office, which made the jobs for the other people in the office more difficult.

According to Plaintiff, Supply Chain Manager Warren Smith, an "indirect" supervisor of Plaintiff, told Plaintiff that another Aramark employee, Pat Kelly was a "tough dyke and an alcoholic" and that Kelly "would like you because she likes a lush ass."

Plaintiff also claims that District Manager Dick Covey harassed Plaintiff. While Plaintiff acknowledges that Covey was not one of her direct supervisors, she claims that she believed he had supervisory authority because of his seniority at the plant and because, she claims, he appeared to be in charge when Hardman and Weis were absent. Defendant denies that Covey did this or otherwise exercised supervisory control over Plaintiff.

According to Plaintiff, Plaintiff reported harassment by Driver Jerry Bryant to Covey, and

Covey told her not to say anything to anyone else, because such action would "cause all kinds of trouble." Plaintiff claimed that Covey took no action with superiors, but Plaintiff acknowledges that Covey must have done something with Bryant because Bryant stopped the harassment and stayed away from Plaintiff. Thereafter, Plaintiff alleges, Covey began harassing her. The conduct included touching Plaintiff on her chest above her breasts, touching Plaintiff's rear end and waist, showing her pages of a Victoria's Secret catalog and offering to buy her lingerie, calling or paging Plaintiff once a day, and, once in January 2002, coercing Plaintiff to come into work after hours, isolating her and putting his hands inside her shirt.

Plaintiff also complains of harassment by other co-workers. Plaintiff alleges that Production Supervisor David Hill was "constantly" making inappropriate comments. She complains that Maintenance Supervisor Bill Miller constantly referred to women as "bitches." After being reprimanded, he began to refer to women as "heifers." She also claimed that he regularly sent Plaintiff crude e-mails and put printouts in her mailbox. He would also tell stories about strip clubs he had visited and times in the Navy when he saw women perform bestiality and other sex tricks. Plaintiff states that, on November 13, 2002, co-workers Dennis Hill and Kathy Isham suggested that Plaintiff and the two engage in group sex over the lunch hour. Plaintiff claims that in March or April 2002, John Cox, a Maintenance Engineer, implied that Plaintiff's work area could be equipped with special equipment if she would be willing to go out with Cox. Thereafter, Cox approached Plaintiff and requested sexual favors on a regular basis. Plaintiff reports that Cox would call ten times a day an would also send sexual and offensive e-mails during June or July 2002. On October 21, 2002, Plaintiff met Cox in a stockroom installing equipment. Plaintiff claimed that Cox pinned her to the wall while propositioning her.

Case 6:03-cv-03425-RED   Document 107   Filed 04/29/05   Page 5 of 28

Plaintiff complained that Driver Jerry Bryant regularly ran his hand across Plaintiff's rear end when she was hidden from view, ten to twenty times in all. She also claims that Bryant ran his hand around her waistline to her back underneath her clothes. The incidents stopped after she complained to Covey, but after Covey was terminated, Bryant began inappropriate touching again. Finally, on October 14, 2002, when Bryant heard Plaintiff was leaving he approached her as she was seated in her car and attempted to kiss her.

Plaintiff alleges that Driver Jim Rogers made daily inappropriate comments and gestures, repeatedly tried to show Plaintiff his nude wedding pictures, and once told Plaintiff that he wondered if her "ass looks as good out of those jeans" and that, when Plaintiff was attempting to fit uniforms into a container that Rogers stated he wished Plaintiff would "jump up and down on me like that." She also claimed that Driver Gary Forrell regularly rubbed his body up against hers like a cat would, and that on September 7, 2000, plant worker Kathy Isham made a comment about women's breasts and pulled up her shirt to expose her breasts.

### 2. The "Sexual Playground"

Plaintiff also complains that the plant was filled with a "culture of sex play" or constituted a "sexual playground." As to this she alleges that a number of Aramark Managers, including David Hill, would engage in sex play with female employees at work, who would then not have time to perform all of their work duties. As a result, Plaintiff felt that she and others had to perform more work to compensate for the reduced work done by the female employees who were engaging in sex play. Plaintiff claims that the managers knew about, acquiesced, and even encouraged this activity. Plaintiff states that she complained to Weis "150 times 7 times" regarding the "sexual playground." One instance, Plaintiff took Weis out to the floor and said "over here we've got David and Dennis

Case 6:03-cv-03425-RED    Document 107    Filed 04/29/05    Page 6 of 28

and Bobby Johnson entertaining Shawna and this has been going on for 20 minutes, so, now you stand right here and watch and see how much longer it goes on." On a number of occasions Plaintiff went to Weis and said "let's take a look at who's sitting on the table swinging their legs." She complained to Weis and Hardman that "David [Hill]'s sleeping preference in this plant should not affect my job or my position" and complained to Hardman that certain women in the plant were getting preferential treatment. Plaintiff testified at her deposition that women who engaged in sexual relations with the managers would be able "to sit on the table at the end of the mending bay swinging their feet because of who they were sleeping with. .... If you didn't join in on that, you were going to lose. If you complained about it, you were going to lose points."

Nothing in the record indicates that Plaintiff complained to anyone except Covey and her daughter about the allegedly harassing touching and comments made directly to her.

### C. Plaintiff's Termination

On September 18, 2002, Plaintiff resigned, telling Hardman that she "Can't take any more of it" and "you'll have to find a replacement for me," giving notice to Hardman that she would not return to work after her vacation, scheduled to start October 4, 2002. She cited job stress as a cause, and did not mention any previous complaints or other abuses otherwise not reported. In response, Hardman told her that he was not going to try to talk her out of resigning "any longer." Three or four days later, Hardman asked Plaintiff if she was sure that she wanted to resign and she confirmed that she was resigning.

Prior to Plaintiff's vacation, she sent Hardman an e-mail about her employment status, reporting that as of October 4 she was no longer on payroll. She asked of Hardman, "[D]o you still need me to help on the 12th with your move [of Aramark from Republic to Springfield, Missouri]?

or any other time after? ... P.S. If Sat the 12th, what time do you plan on starting this little adventure...." Hardman responded by writing "You are here for as long as you will stay."  Smith responded, writing, "Becky needs to reinstate you on the payroll until further notice."

Effective October 7, 2002, Aramark hired Charles Hynson as the Stockroom Supervisor. Hinson took over Plaintiff's responsibilities but was also responsible for the Safety Program and the Stockroom.  Hynson directed eight to ten employees at a time, while Plaintiff directed two at a time. Hynson was a salaried employee while Plaintiff was an hourly employee.

On October 11, 2002, Plaintiff returned to work following her vacation.  Aramark moved its Market Center to Springfield the next day.  She offered to orient Hynson to the position and did not identify any job in which she wanted to work.  When talking about a different position, Hardman told Plaintiff that "Roger and I can find somewhere to work you."  Hardman determined that Friday, November 8 would be Plaintiff's last day in the stockroom because the employees were confused as to whom to report.  At that time, Plaintiff had not requested a different job, and none of Defendant's employees had suggested a different job for Plaintiff to perform.

Plaintiff left work early on November 8 and claims that she left Hardman a voice mail message saying that she would not return to work and asking that Hardman contact her.  Hardman denies receiving the message.  On the same day she claims that she told Weis that if Defendant wished to put her in a new position to call her and let her know.  Plaintiff admits that the last word from Hardman was that she still had a job; neither Hardman nor Weis told her not to return to work. Plaintiff did not return to work the next week.  On Monday, November 11, Charles Hynson, Plaintiff's replacement, called Plaintiff's daughter.  Plaintiff answered and Hynson recognized her voice.   Hynson asked Plaintiff's daughter whether she was coming in or whether she had quit, as

-8-

well as her mother.  Neither Hynson nor Plaintiff discussed any employment opportunities for Plaintiff.

Aramark's Employee Handbook provides that an employee will be assumed to have resigned if the employee fails to notify management of an absence for three scheduled workdays.  Aramark in response to a request by Plaintiff, explained that Plaintiff's employment was terminated because she failed to report to work on Monday November 11, Tuesday, November 12, and Wednesday, November 13, 2002.

Plaintiff claims that she told Hardman and Weis that she would consider a different job at Aramark if they wanted to propose one.  She claims that she talked with Hardman on November 5 and 6, and that Hardman told her that Hardman, Weis, and Plaintiff would discuss it on Friday, November 8.  She claims that although she saw Hardman three times that day, he did not mention anything about a new job.  She claims that she told Hardman (via a voice mail message) and Weis (in person) that they should call her if she was still employed with the company.  Hardman believed that Plaintiff performed her job competently, and during Hardman's deposition, he stated that she is eligible for re-hire.

*D. Defendant's Policies and Procedures*

Defendant claims that at all times it had posted the Harassment Free Workplace Policy, EEO policy and other harassment-related documents outside the break rooms at Plaintiff's work locations. Plaintiff alleges that the first time these documents were available was on March 31, 1999. Defendant also held sexual harassment training seminars for management in 1995, 1996, 1998, 2001, and 2002.  Plaintiff claims that she was not allowed to attend such sessions and that a limited number of people in Springfield attended.  Additionally, Plaintiff received copies of Defendant's

Employee Handbooks in 1998 and 2002.  Defendant has provided copies of the Handbooks; both of these copies contain a Harassment Free Workplace Policy, separately addressing sexual harassment, as well as an Equal Opportunity Policy and Affirmative Action provision.  Plaintiff admits receiving the 1998 and 2002 handbooks, but denies that these provisions were in her copy of the 1998 handbook.  Plaintiff did not produce her copy of the 1998 handbook, but rather testified that she cannot remember whether or not it had a harassment free workplace policy.  She testified that "I honestly do not recall seeing anything that said harassment.  It doesn't mean it wasn't in there." *Pl.'s Depo.* vol. 2 p. 410 at li 24-25.

Defendant's policies as listed in the handbooks provided by Defendant provide that an employee who believes that she has been a victim of harassment report the incident immediately to her supervisor.  If such a report would be inappropriate, the employee must report the incident to the next level of management or, in the alternative to the local, regional, or Business United Human Resources Professional.  A substantially similar procedure is outlined in both the 1998 and 2002 handbooks.  In the 2002 handbook, at the end of the Harassment Free Workplace Policy section, in bold, all-capital letters, is the following statement:

> IF YOU FEEL THAT YOU HAVE BEEN A VICTIM OF HARASSMENT, OR IF YOU WOULD LIKE TO SPEAK WITH SOMEONE REGARDING AN INCIDENT, YOU MUST CONTACT YOUR IMMEDIATE SUPERVISOR, THE NEXT LEVEL OF MANAGEMENT, YOUR LOCAL, OR REGIONAL HUMAN RESOURCES PROFESSIONAL (#_____), OR THE EMPLOYMENT PRACTICES DEPARTMENT (818/973-3523).

*Employee Handbook, Non Union Edition*, ex. 27, vol. II, *Def.'s Ex. Booklet Submitted in Support of Def.'s Mot. for Summ. J.* at 56.

Additionally, in October 2001, Defendant implemented a 24-hour Employee Hotline for employees to use to report violations of Aramark's work policies.  Defendant claims that each

-10-

General Manager was instructed to hold a meeting with all employees to review a videotape discussing the Hotline and to distribute Hotline wallet cards to employees. Defendant claims that Plaintiff attended the meeting. Plaintiff denies that she attended such a meeting or ever saw the video. Her deposition testimony is inconsistent.[2] Defendant states that they distributed wallet cards about the Hotline, put up posters regarding the Hotline, and sent e-mails to all Aramark employees with computers about the Hotline. Plaintiff denies ever seeing any posters and claims that she did not receive a wallet card until after she received her 2002 handbook. She also claims that David Hill, who distributed the cards, called them 1-800-tattletale cards. Plaintiff has also alleged that others who used the hotline were retaliated against for its use.

---

[2]  At one point, Plaintiff testified at her deposition as follows:
Q: ... Did you attend any meetings where Aramark's 800 hotline was discussed?"
A: Yes.
Q: When was that?
A: 2001, maybe. End of 2000, first of 2001.
...
Q: who presented the meeting on Aramark's 800 hotline?
A: Someone from human resource....
Then later, Plaintiff testified:
    A: On the 1-800 number, there was not actually a meeting discussing the 1-800. There was a day where Roger and David brought out and distributed little 1-800 cards.
    *Pl.'s Depo.* at 40 li 10 - 41 li. 12.

Elsewhere, Plaintiff testified:
    Q: [D]uring the year 2002 did someone give you a card that said something about a hotline and an 800 number?
    A; Yes.
    ...
    A: It would have been in August 2002 –
    ...
    Q: Did anyone in any training session that you participated in ever explain what to do if you thought you were being harassed or a subject of discrimination?
    A: No
    *Pl.'s Depo* vol. II at 485 li 20 - 486 li 8; *Id.* vol. II at 488 li. 5-8.

Case 6:03-cv-03425-RED   Document 107   Filed 04/29/05   Page 11 of 28

Finally Defendant claims that it has presented on-line seminars on topics such as sexual harassment in the workplace and that the policies were available on Aramark's intranet. Long claims that she, as an hourly employee, was not allowed to view the seminars and was not aware of Aramark's intranet.

## II. Standard of Review

Rule 56(c) Federal Rules of Civil Procedure provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fry v. Holmes Freight Lines, Inc.*, 73 F. Supp. 2d 1074 (W.D. Mo. 1999). When ruling on a motion for summary judgment, the court should view the facts in the light most favorable to the adverse party and allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *See id.* (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970)); *Reed v. ULS Corp.,* 178 F.3d 988, 990 (8th Cir. 1999)).

An issue is "genuine" if "'the facts and circumstances relied upon ... attain the dignity of substantial evidence'" and create more than a suspicion. *Swanson v. Van Otterloo*, 993 F. Supp. 1224, 1231 (N.D. Iowa 1998) (quoting *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (further quotations and citations omitted)). To create a "genuine" issue, the evidence raised by the nonmoving party "'must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Swanson*, 993 F. Supp. at 1231 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986). An issue is "material" if it has a "real basis" in the record and would affect the outcome of the suit. *Swanson*, 993 F. Supp. at 1230 n.8 (citations and quotations omitted).

If there is no genuine issue about any material fact, summary judgment is proper because it

avoids unnecessary and costly litigation and promotes judicial efficiency. *See Fry*, 73 F. Supp. 2d 1075 (citing *Smith v. Marcantonio*, 910 F.2d 500, 502-03 (8th Cir. 1990); *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir. 1979)). The summary judgment procedure is not a "disfavored procedural shortcut." *Id.* Rather, it is "an integral part of the Federal Rules as a whole." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Cunningham v. Kansas City Star Co.*, 995 F. Supp. 1010, 1014 (W.D. Mo. 1988) (citing *Celotex,* 477 U.S. at 324).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The evidence in favor of the nonmoving party must be more than "merely colorable." *Id.* When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (footnote omitted).

## III. Analysis

Plaintiff's six-count Petition, brought under state and federal law, alleges that Defendant discriminated against her on the basis of sex, resulting in her constructive discharge; that Defendant subjected Plaintiff to a hostile work environment; that Defendant retaliated against her for protected conduct; that Plaintiff was paid less than a man would have been paid in the job;[3] and that she is

---

[3]    In Plaintiff's Suggestions in Opposition, Plaintiff advises that she has abandoned her equal pay claim.

-13-

entitled to punitive damages and attorney's fees. Each claim shall be addressed separately.[4]

## A. Hostile Work Environment

Under Title VII, an employer is prohibited from discriminating against any individual with respect to his/her compensation, terms, conditions, or privileges of employment because of his/her race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). For Plaintiff to state a claim of hostile work environment, she must show that (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action. *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000); *Ross v. Douglas County, Neb.*, 234 F.3d 391, 395-96 (8th Cir. 2000).

The third element requires that the harassment be based on Plaintiff's sex. The underlying issue is whether members of one sex are subjected to unfavorable conditions of employment when members of the opposite sex are not subjected to unfavorable conditions. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). To succeed, a plaintiff must demonstrate that she was "singled out" for harassment because of her gender. *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 735 (8th Cir. 2000) (citations and quotations omitted). The content of the harassment may not be "tinged with offensive sexual connotations," but must be motivated because of the *gender* of the alleged victim. *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005) (quoting *Oncale*, 523 U.S. at 81 (1998)).

---

[4] Plaintiff's identical claims under the Title VII Missouri Human Rights Act, however, will be analyzed together.

The fifth element of the claim applies only to non-supervisory harassment. *Palesch*, 233 F.3d at 566 n.5; *Ross*, 234 F.3d at 396 n.5. An employer may be subject to vicarious liability for hostile work environment when a supervisor engages in the harassment; otherwise, the plaintiff must prove that the employer knew or should have known about the harassment and was negligent in preventing it. *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1056 (8th Cir. 2004) (citing *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Oncale*, 523 U.S. at 81 (internal quotation omitted). In determining whether the conduct is sufficiently severe or pervasive the Court looks to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

In this case, there are two types of facts upon which Plaintiff bases her harassment claim. First, there are the facts underlying her claim that the Center was a "sexual playground" or that there was a "culture of sex play" at the workplace. Second, there are the factual allegations indicating that her co-workers and supervisors made inappropriate, sexual comments toward Plaintiff, attempted to engage in romantic and sexual relationships with Plaintiff, and inappropriately touched Plaintiff's person.

-15-

## 1. "Sexual Playground" and Hostile Work Environment

It is clear from the record that the vast majority, if not the entirety, of Plaintiff's complaints to persons who were her supervisors involved the "sexual playground" rather than any specific comments or actions taken against Plaintiff herself. It is also clear that Plaintiff, while possibly offended at some of the sex play and conversation, was most disturbed by the "sexual playground" because it lead to inefficiency among the workers she was required to oversee. For example, in her deposition, Plaintiff complained that, while she was being personally harassed, "I'm in the process of trying to run an area. I'm baby-sitting four girls and five guys that have got no time to do anything but stand over here and play with each other ..." *Pl.'s Depo.* at 132 li 22-25. Similarly, she stated that "I have to run these damn boys off from this and I have to make these women do their jobs, and then when they don't, I have to do their jobs because they're too busy planning their next sexual conquest or setting up an arrangement to meet with one of these boys. I was just tired of that. ... I couldn't get Roger to put a stop to it." *Id.* at 143 li. 17-23. Plaintiff admitted that, at most, she complained about harassment directed at her by complaining about the "sexual playground" atmosphere.

The "sexual playground" that Plaintiff complained about to her superiors was not directed at her. It affected her, Plaintiff stated in her own deposition testimony, because it made her work more difficult—she would have to pick up the slack when her employees would go off to play. However, these facts do not support Plaintiff's hostile work environment claim because Plaintiff did not suffer harassment that affected a term or condition of her employment based on *her* sex. A sexual harassment claim requires Plaintiff to prove that she was "singled out because of her gender." *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 753 (8th Cir. 2000) (citations omitted); *see*

*Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997) ("[T]he plaintiff must show that the conduct was discriminatory in nature and that she was singled out for such treatment on the basis of her membership in a protected class." (citations omitted)); *see also Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir. 2002) (stating that the victim of a racially hostile work environment must show that he was the "target of severe or pervasive harassment"). Plaintiff was not the "target" of this activity. If anything, because of the "sexual playground," Plaintiff was singled out not because she was a woman, but because she was a supervisor—the "playground" required Plaintiff to do more work to pick up the slack of the employees who were "planning their next sexual conquest." The same problem would arise if Plaintiff had been a male supervisor. Thus, this activity, about which Plaintiff claims to have constantly complained to her superiors, cannot be the basis for *her* sexual harassment claim. In the same way, Plaintiff is not discriminated on the basis of *her* sex because her co-workers provided paramours with special preferences, making her job more difficult. *See DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 308 (2d Cir. 1986) (holding that male candidates for a promotion could not sue for discrimination under Title VII when the supervisor tailored the position to favor his paramour, because they "faced exactly the same predicament as that faced by any woman applicant for the promotion: No one but [the supervisor's paramour] could be considered for the appointment because of [his] special relationship to" the paramour).

### 2. Specific Incidents of Conduct and Hostile Work Environment

Plaintiff also complains of other actions and comments directed at her specifically. These may also be sub-categorized into two groups, as described in Section I.B.1, *supra*: actions taken by her supervisors and actions taken by her co-workers.

-17-

*i. Defining "Supervisors"*

The question that arises, then, is: Who is a supervisor and who is a co-worker?  In creating the supervisor/co-worker dichotomy in *Burlington Industries, Inc v. Ellerth* and *Faragher v. City of Boca Raton*, the Supreme Court stated that employers were vicariously liable for a harassment/hostile work environment claim when a "supervisor with immediate (or successively higher) authority over the employee" has engaged in the harassment. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  The Court did not further define "supervisor" in the cases.  However, the Eighth Circuit, joining a majority of other circuits to decide the issue, has determined that a "supervisor" "'must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties.'"*Weyers*, 359 F.3d at 1057 (quoting *Joens v. John Morrell & Co.*, 354 F.3d 938 (8th Cir. 2004); *accord Noviello v. City of Boston*, 398 F.3d 76, 95-96 (1st Cir. 2005) ("[T]he essence of supervisory status is the authority to affect the terms and conditions of the victim's employment, [which] primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." (quotations and citations omitted)); *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 & n.2 (7th Cir. 2004) (holding that a supervisor must be "vested with the authority to alter the terms and conditions" of the plaintiff's specific employment (citations omitted)); *cf. Mack v. Otis Elevator Co.*, 326 F.3d 116 126 (2d Cir. 2003) (holding that the definition of "supervisor" "is, instead, whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates.").  "In the usual case, 'a supervisor's harassment involves misuse of actual power, not the false impression of its existence.'" *Soto v. John Morrell & Co.*, 315 F. Supp. 2d 891, 991 (N.D. Iowa 2004) (quoting

-18-

*Ellerth*, 524 U.S. at 759). Apparent authority by itself is rarely, if ever, a sufficient basis to support a finding of supervisor status. *Weyers*, 359 F.3d at 1057 n.7; *Soto*, 315 F. Supp. 2d at 991 n.4 (noting that the "ordinary case" of supervisor harassment would involve only abuse of actual authority).

In this case, it is undisputed that Walker, Hardman and Weis were actual supervisors of Plaintiff. Plaintiff, however, alleges that Dick Covey, who supposedly touched her repeatedly in inappropriate places, attempted to kiss her, repeatedly called and paged her, and tried to buy her lingerie, was also a supervisor. Plaintiff alleges that when Hardman and Weis were absent from the plant that Covey appeared to be in charge. She also stated that Covey had "the power to impact on the General Manager's personnel decisions" and that it seemed to her that he had the authority to correct the drivers' work and "to give her guidance in the performance of her duties." *Pl.'s Suggestions in Opp.* at 19 ¶ 35. Plaintiff never states that she worked under Covey nor does she offer any evidence other than her own perceptions that Covey was a General Manager *pro tempore*. Additionally, the only time Plaintiff complained to Covey was in relation to Jerry Bryant, an employee supervised by Covey. Plaintiff did not complain to Covey about any of the other activities engaged in by employees not supervised by Covey. This is objective evidence indicating that Plaintiff did not believe Covey to be her supervisor or someone in general control of the entire plant, but instead a manager with power to oversee a few employees (not including Plaintiff) at the Market Center.

Even taking Plaintiff's allegations as true, Covey cannot be Plaintiff's "supervisor" for Title VII purposes. Even if Covey could give Plaintiff guidance in the performance of her duties, and was able to advise Hardman and Weis regarding personnel decisions, he was not vested with the authority, himself, to take tangible employment action against Plaintiff. *See Rhodes*, 359 F.3d at 506

-19-

(noting that individuals who managed the plaintiff's work assignments, investigated disputes, and made recommendations concerning sanctions rules violations were not "supervisors" because they did not have the authority to make decisions regarding the terms and conditions of the plaintiff's employment). Plaintiff did not work under Covey; Covey did not have the authority to hire, fire, demote, or take other employment action against Plaintiff. Covey, therefore, cannot be considered to be Plaintiff's supervisor for purposes of the claims in this suit.

### ii. Supervisor Harassment

Plaintiff argues that the actions of her actual supervisors—Walker, Hardman, and Weis—created a hostile work environment. There is little evidence in the record indicating that these actions and comments would be "severe and pervasive" as a matter of law. Plaintiff alleges that Walker spent one day in 1997 following and "hitting on" Plaintiff and then avoided her after that day. She alleges that Hardman asked her whether she "had been practicing" to perform the urination act demonstrated in a picture the two had seen at a bar the night before. She also alleges that Hardman knew about the "sexual playground" and did nothing about it. Finally, she alleges that Weis "hung around" Plaintiff unnecessarily, frequently talked about his sex life, suggested sexual trysts between Plaintiff and other co-workers, and told Plaintiff to hire pretty women. Viewed as conduct occurring over the course of five years, these activities do not appear to create a hostile work environment as a matter of law. *Cf. Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934-35 (8th Cir. 2002).

Assuming for the sake of argument that there is at least an issue of fact regarding the hostile work environment, Defendant argues that it is entitled to the affirmative defense created from the Supreme Court cases *Faragher v. City of Boca Raton*, 524 U.S. 775( 1998) and *Burlington*

*Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Those cases provide Defendant with an affirmative defense warranting summary judgment if any harassing conduct did not result in an adverse employment action and Defendant (1) exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities by Defendant.

First, Defendant included an anti-harassment policy in handbooks given to Plaintiff in 1998 and 2002. A procedure was listed in both handbooks for complaining of harassment. The same policy was also posted and available on the company intranet. The policies suggested that a potential victim contact their supervisors, or if that was not appropriate, to contact someone in human resources. Plaintiff had met various human resource workers throughout her employment at Aramark, but never contacted any human resources officer to complain about sexual harassment. Plaintiff recognized at her deposition that she should have contacted human resources, but did not.

Defendant also notes that in 2001 it instituted the Employee Hotline to make anonymous complaints regarding workplace issues. Defendant argues that a video was shown demonstrating how to use the hotline, and wallet cards were handed out alerting employees to the Hotline's presence.

Plaintiff denies that she ever saw the policy posted, that she had access to the intranet, or that she saw the policy in the 1998 handbook. Plaintiff also claims that she never saw a video about the Hotline, that when the wallet cards were distributed (a year too late) that they were referred to as "1-800-tattletale" cards by her coworkers, and that other employees who used the hotline to complain

(but not about sexual harassment) were retaliated against.[5]

Defendant has provided a copy of the 1998 handbook as an exhibit, and the policy is included in the handbook. Plaintiff says she does not recall seeing the policy in her copy, which she has not produced for this case. Therefore, there is simply not a genuine issue as to the contents of the handbook. Plaintiff admitted that she did receive a wallet card referring to the Hotline and knew of its availability and use by others. Despite her denial, Plaintiff testified in her deposition that she attended a meeting at the end of 2000 or first of 2001 where someone from Human Resources discussed Aramark's 800 hotline.

The long and short of this is that there is ample evidence to conclusively prove that Plaintiff was made aware of the anti-harassment policy and the proper procedure for filing complaints. Plaintiff's failure to follow through with any of the procedures was unreasonable. Plaintiff could have complained to Hardman about Weis's allegedly inappropriate behavior. She could have contacted someone in Human Resources. She could have called the Employee Hotline. Plaintiff may have had a subjective fear of retaliation if she called the Hotline. She may have subjectively believed that because Hardman did little about the "sexual playground," that he would not have addressed her complaints about Weis. But rather than doing anything to help her situation, she did *nothing*. Because the actions by her supervisors are not severe and pervasive as a matter of law, and because Plaintiff failed to take advantage of the preventative or corrective opportunities afforded to her by Defendant, summary judgment must be granted to Defendant on Plaintiff's hostile work environment claims. The court also notes two other factors that are not consistent with Plaintiff's

---

[5] Defendant denies that those employees were retaliated against, and in its Suggestions in Support, notes that three of the four employees that Plaintiff names are still employed with Defendant.

claimed fears and these are the fact she allowed her daughter to be employed there and she willingly continued working after she had announced her resignation.

### *iii. Co-Worker Harassment*

It appears that Defendant concedes that the actions taken by her co-workers were severe and pervasive for purposes of summary judgment. However, as articulated in the test above, Defendant may be liable for a hostile work environment only if the harassment was based on Plaintiff's sex, and the employer knew or should have known of the harassment and failed to take remedial action.

Many of the incidents Plaintiff alleges, although sexually charged, were not based on Plaintiff's sex. For example, Driver Jim Rogers attempted to show Plaintiff his nude wedding photos. Yet, Rogers showed the same photos to all of the employees (male and female) at the plant. Such actions and comments cannot be the basis of a hostile work environment claim based on Plaintiff's sex.

Even assuming that the majority of the co-worker actions were targeted at Plaintiff because of her sex, there is no evidence in the record that she ever complained about them to Hardman, Walker, or Weis, her supervisors, or to Human Resources. Plaintiff cites to a number of statements made in her deposition about her complaints, but they all related to the "sexual playground" and not to specific conduct directed against her. In fact, Plaintiff admitted that "I tried [to complain to] Roger. I – indirectly without ever saying it was the harassment toward me. I tried to talk to Brian about the crap going on in there thinking that if I could stop the crap on that floor, it would stop on my level, too." *Pl.'s Depo.* at 165 li. 10 -14.

Her only complaints about specific conduct were to Dick Covey – a person who was not Plaintiff's supervisor. Although Plaintiff may have believed him to have some sort of *de facto*

authority because of his seniority, Plaintiff has not provided any proof beyond her bare assertion that he seemed to be in charge when the other supervisors were not at the plant. As discussed above, Covey cannot be considered a "supervisor" under Title VII, and Plaintiff's complaints to him are not relevant in determining whether Defendant had notice of such action. Additionally, Plaintiff complained to Covey about Jerry Bryant's inappropriate touching—thereafter, Bryant stopped. Thus, her complaint to Covey about harassment by one employee apparently was effective in ending that harassment. Covey was not Plaintiff's supervisor, and there is no evidence that Plaintiff's true supervisors knew about any harassing activities directed at Plaintiff.

It would not have been reasonable for them to know. The actions Plaintiff complained of were described by Plaintiff to have been taken when Plaintiff was isolated. For example, Plaintiff alleged that Forrell rubbed himself up against her when she was isolated in rows of hanging clothes. She claims that John Cox pinned her to the wall and made sexual propositions when they were alone installing stockroom equipment. Bill Miller sent crude e-mails to Plaintiff personally that were not distributed company-wide.

Plaintiff claims that it would have been futile to complain to either Weis or Hardman, but yet she stated that she complained to Weis "150 times 7 times" about the "sexual playground" issue. She felt free to complain to her supervisors about female workers sitting on a table and swinging their legs and about others' sexual conquests, but did not once make a complaint about harassment she now claims was directed toward her. There is no evidence to suggest that Defendant should have known about the alleged co-worker harassment. Because Plaintiff failed to report any of the co-worker harassment to her supervisors, to a human resources official, or to the hotline, Defendant cannot be liable for any possible hostile work environment as a matter of law.

-24-

## B. Discriminatory Discharge/Constructive Discharge

Plaintiff claims that Defendant is not entitled to the *Faragher-Ellerth* defense because the hostile work environment was so intolerable that she was forced to quit. Thus, Plaintiff argues, she was constructively discharged.

> A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit. To constitute a constructive discharge, the employer must deliberately create intolerable working conditions with the intention of forcing the employee to quit and the employee must quit. The intent element is satisfied by a demonstration that quitting was a reasonably foreseeable consequence of the employer's discriminatory actions.

*Breeding v. Arthur J. Gallagher & Co.* 164 F.3d 1151, 1159 (8th Cir. 1999) (quotations and citations omitted). A necessary condition to bringing a claim of constructive discharge is that the employee actually left employment. *Pedro-Cos v. Contreras*, 976 F.2d 83, 85 (1st Cir. 1992). In this case, Plaintiff submitted her resignation in September 2002, to be effective in October 2002. She then returned to work after her vacation and continued to work until November 8, 2002. Defendant asserts that Plaintiff rescinded her resignation; Plaintiff argues that she "briefly continued working to help move to the new plant and was willing to discuss staying on in a different job if one were available." Regardless of the characterization, the fact is that Plaintiff continued to work after her "resignation." She was reinstated on the payroll; none of her supervisors ever told her she was terminated. Plaintiff did not quit in September and October 2002. She stopped going to work in November 2002 because she says she believed that there was no job available for her. Plaintiff admits that the last word she received from her supervisor, Hardman, was that she still had a job with Defendant. She also admits that neither Hardman nor Weis told her not to return to work. Plaintiff's decision to terminate her employment with Defendant under these circumstances cannot constitute constructive discharge.

For the same reasons, Plaintiff cannot bring a discriminatory discharge claim. Plaintiff has brought forth no evidence that she was terminated because of her sex—in fact, she has brought forth no evidence that she was terminated at all. Even viewing the facts in a light most favorable to Plaintiff, Plaintiff never once was told that she was terminated (even if someone else had taken over her former job), and no one told her not to return to work on November 10, 2002. Plaintiff had an e-mail from her supervisor that stated "You are here for as long as you will stay," and later Plaintiff was told, "Roger and I can find somewhere to work you." After failing to call in or report for work on November 10, 11, and 12, 2002, Plaintiff was terminated pursuant to Defendant's policies. Plaintiff does not argue that such policy was discriminatorily enforced only against her because of her sex, nor does she offer any evidence that the termination was pretextual. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claims of actual and constructive discriminatory termination.

## C. Retaliation

Plaintiff has alleged that Defendant retaliated against her for engaging in protected conduct. To state a retaliation claim, a plaintiff must show that she (1) engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that the two events are causally connected. *Stevens v. St. Louis Univ. Med. Ctr.*, 96 F.3d 268, 270 (8th Cir. 1996).[6] Plaintiff states that

---

[6]     Defendant argues that Plaintiff's claim of retaliation should be barred because of Plaintiff's failure to exhaust administrative remedies on the issue. In her EEOC complaint, Plaintiff did not check the box marked "retaliation." Additionally, she mentions retaliation only once, stating that Defendant committed acts "because of her gender and in retaliation for her complaints." The failure to raise a claim of retaliation at the EEOC level can bar the consideration of such a claim in court. *See Watson v. O'Neill*, 365 F.3d 609, 614 (8th Cir. 2004). Because Plaintiff cannot plead a *prima facie* case of retaliation, the Court does not address whether Plaintiff has exhausted her remedies on this issue.

Case 6:03-cv-03425-RED    Document 107    Filed 04/29/05    Page 26 of 28

Defendant retaliated against her by not giving her paperwork she needed to check in uniforms from one account or any other job that she was performing in the stockroom. Plaintiff was not disciplined for failing to obtain the necessary paperwork. Thus, there is no proof that Plaintiff suffered an adverse employment action on account of her engaging in any protected activities. Her retaliation claim fails.

### D. Equal Pay, Punitive Damages, and Attorney's Fees

In her Petition, Plaintiff stated that she was discriminated against because she was paid less than a man would have been paid in the same job. In her Suggestions in Opposition to the Motion for Summary Judgment, Plaintiff advised that she "has abandoned her claim of disparate wages because of sex." *Pl.'s Suggestions in Opposition* 13 at ¶ 120. The Court, viewing the record as a whole, sees no basis for such a claim. Thus, summary judgment shall be granted to Defendant on this claim as well.

Defendants last two claims are for punitive damages and attorney's fees. These are not independent claims, but rest on a finding of liability under Title VII or the Missouri Human Rights Act. Because the Court holds that Defendants are entitled to judgment as a matter of law on the substantive counts of Plaintiff's Petition, she is therefore not entitled to punitive damages or attorney's fees. Summary judgment will be granted on these counts as well.

### IV. Conclusion

Accordingly, and for the reasons stated above, it is hereby

ORDERED that Defendant's Motion for Summary Judgment (Doc. 60) is **GRANTED.**

Judgment shall be entered in favor of Defendant on all counts of Plaintiff's Petition.

**IT IS SO ORDERED.**

DATE:          April 29, 2005          _/s/ Richard E. Dorr_____
                                        RICHARD E. DORR, JUDGE
                                        UNITED STATES DISTRICT COURT